Approved: _____
          T. JOSIAH PERTZ
          Assistant United States Attorney

Before:  THE HONORABLE JUDITH C. McCARTHY
          United States Magistrate Judge
          Southern District of New York

```
- - - - - - - - - - - - - - - - X     21 MAG 5058
                                 :
IN THE MATTER OF                 :     SEALED COMPLAINT
                                 :
THE EXTRADITION OF               :     Violation of 18 U.S.C.
                                 :     § 3184
RORY MCGRATH                     :
                                 :
                                 :
                                 :
                Defendant.       :
                                 :
- - - - - - - - - - - - - - - - X
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

      I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

      1.   In this matter, I represent the United States in fulfilling its treaty obligation to the United Kingdom.

      2.   There is an extradition treaty in force between the United States and the United Kingdom of Great Britain and Northern Ireland.  The series of documents that comprise the extradition treaty are more fully described as follows: Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY

Doc No. 108-23 (2004) (the "2003 Treaty") and related Exchanges
of Letters, *as amended by the* Instrument as contemplated by
Article 3(2) of the Agreement on Extradition Between the United
States of America and the European Union signed 25 June 2003, as
to the application of the Extradition Treaty Between the
Government of the United States of America and the Government of
the United Kingdom of Great Britain and Northern Ireland signed
31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. No. 109-14
(2006) (the "Instrument"), with Annex (the "Annex") reflecting
the integrated text of the operative provisions of the 2003
Treaty and the Instrument.  Collectively, the 2003 Treaty, the
Instrument and the Annex are referred to in this Complaint as
the "Treaty."

      3.  Pursuant to the Treaty, the Government of the
United Kingdom has submitted a formal request through diplomatic
channels for the extradition of Rory McGrath ("McGrath").

      4.  Tom Heinemann, Assistant Legal Adviser in the
Office of the Legal Adviser for the U.S. Department of State,
has provided the U.S. Department of Justice with a declaration
authenticating a copy of the diplomatic note by which the United
Kingdom made its request for extradition, stating that Article 2
of the Annex covers the offenses for which the United Kingdom
seeks extradition, and confirming that the documents supporting
the request for extradition bear the certificate or seal of the

of the Ministry of Justice, or the Ministry or Department responsible for foreign affairs of the United Kingdom, in accordance with Article 9 of the Annex, so as to enable them to be received in evidence.

5.    The declaration from the U.S. Department of State with its attachments, including copies of the diplomatic note from the United Kingdom and the Treaty (attached hereto as **Exhibit 1**), and the certified documents the United Kingdom submitted in support of the request (attached hereto as **Exhibit 2**) are incorporated herein by reference.

6.    According to the information the Government of the United Kingdom has provided, McGrath is accused of two counts of assault occasioning actual bodily harm, arising from his 1980 attacks on a police officer (the "victim officer"):[1]

- Extradition Count 1:  With others inflicted actual bodily harm upon Ian Geoffrey Moore at Aberfold Road, Garforth, contrary to Section 47 of the Offences Against the Person Act 1861; and

- Extradition Count 2:  With others caused actual bodily harm to Ian Geoffrey Moore at the Miners Arms Public House, contrary to Section 47 of the Offences Against the Person Act 1861.

---

[1] McGrath also was charged in the United Kingdom with other counts for which the United Kingdom does not seek extradition.

(Ex. 1 at 4.)

7. McGrath committed these offenses within the jurisdiction of the United Kingdom.  On October 24, 1980, the Leeds Crown Court issued a warrant for McGrath's arrest, after McGrath violated his bail conditions by failing to appear in the matter.  The warrant, which remains valid and enforceable in the United Kingdom, issued on the basis of the following facts:

a.   This case involves two assaults on the victim officer, which occurred within a short period of time on March 28, 1980, in Garforth, Leeds, England.  That evening, the victim officer came across a group of young men behaving rowdily on a garage forecourt at Aberford Road.  One young man ("DB") accused another, Leslie Swithenbank ("Swithenbank"; one of McGrath's co-defendants) of assault.  Swithenbank tried to attack DB again. The victim officer interceded and managed to detain Swithenbank. Swithenbank and a group of his associates assaulted the victim officer, knocking him to the ground and kicking him repeatedly.

b.   The group desisted and ran off, but the victim officer pursued and found them in the car park at Miners Arm pub, where some of them were in the process of getting into Swithenbank's car.  The victim officer tried to detain one of them (McGrath), who punched the victim officer in the face.  The group further attacked the victim officer, kicking him while he

was on the ground.  Another police officer ("Officer-2") arrived

and pursued two of the young men, to no avail.

       c.   The injuries the victim officer sustained

included a fractured and bloody nose that required surgery,

scalp laceration that required suturing, chipped bottom and top

incisor teeth, abrasions to the forehead and chin, and a bruised

right thumb with pain on flexion.

       d.   The next day, Officer-2 saw McGrath and

identified him as one of the men he chased away from the victim

officer.  Additionally, in the course of a subsequent committal

hearing, the victim officer identified McGrath as the person who

punched him in the face.

       e.   McGrath was charged with, as relevant here, two

counts of assault inflicting actual bodily harm.

       d.   McGrath's co-defendants were convicted of assault

occasioning actual bodily harm and received custodial sentences.

McGrath, however, fled the jurisdiction shortly after appearing

before a Magistrate Court in Leeds in connection with the

prosecution.

       e.   Before fleeing, McGrath provided conflicting

versions of events but eventually admitted that he went in

Swithenbank's car to the Gascoigne pub and was with Swithenbank

"and some other blokes" in Garforth.  McGrath initially stated

that he did not sit in the front of Swithenbank's car but

5

changed his account after hearing that someone getting into the back of Swithenbank's car had attacked the victim officer. Although McGrath claimed that he remained at the Gascoigne pub for the entire time when the assaults in question occurred, witnesses described a group of young men (including two individuals whose descriptions matched Swithenbank and McGrath) who left the Gascoigne pub around 10:00 p.m., with Swithenbank. McGrath, and co-defendant Michael Racz (by Racz's admission) each returning around 45-60 minutes later.

       f.  McGrath's co-defendants further implicated him in the assaults.  Swithenbank admitted that he was in Garforth with four others; that he had been fighting with another group of youths and "they were giving us a load of lip so I went and cracked one everybody joined in and we knacked [*sic*] 'em"; that the victim officer had sat on Swithenbank; that Swithenbank and his friends hit the victim officer in an attempt to escape; that Swithenbank kicked the victim officer once after breaking free; that McGrath was with Swithenbank and "got one of the bastards off my back"; and that Swithenbank then returned to his car, which was parked at the Miners Arms, but "Rory didn't get the chance to get in"; and that Rory "booted the cop."  Co-defendant Willie Lunn, who admitted to participating in the first fight and punching the victim officer at least four times, stated that McGrath was "the worst" in the fight.

8. According to information provided in the extradition request and confirmed by the United States Marshals Service, McGrath may be found within the jurisdiction of this Court at 240 Holt Drive, Pearl River, New York.  (Ex. 2 at 5, ¶ 8.)

WHEREFORE, the undersigned requests that a warrant for McGrath's arrest issue in accordance with 18 U.S.C. § 3184 and the Treaty, so that McGrath may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered, and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

_____
T. Josiah Pertz
Assistant United States Attorney


Sworn to me by reliable electronic means, in accordance with
Fed. R. Crim. P. 4.1.

Date: May 11, 2021                **(By FaceTime)**


_____
THE HONORABLE JUDITH C. McCARTHY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit 1

DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, hereby declare and say as follows:

1.  I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State,
    Washington, DC. This office has responsibility for extradition requests within the
    Department of State, and I am familiar with the extradition case of Rory McGrath. I make
    the following statements based upon my personal knowledge and upon information made
    available to me in the performance of my official duties.

2.  The relevant and applicable treaty provisions in full force and effect between the United
    States and the United Kingdom are found in the Extradition Treaty Between the Government
    of the United States of America and the Government of the United Kingdom of Great Britain
    and Northern Ireland, and related Exchanges of Letters, signed 31 March 2003 ("the
    Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on
    Extradition between the Government of the United States of America and the European
    Union signed 25 June 2003, as to the application of the Extradition Treaty Between the
    Government of the United States of America and the Government of the United Kingdom of
    Great Britain and Northern Ireland signed 31 March 2003 (the "Instrument"), signed at
    London 16 December 2004. The Annex to the Instrument (the "Annex") reflects the
    integrated text of the operative provisions of the Treaty and the Agreement on Extradition
    between the United States of America and the European Union signed 25 June 2003. A copy
    of the Instrument with Annex is attached to this declaration.

3.  In accordance with the provisions of the Annex, the British Embassy has submitted Embassy
    Note No. 088/2019, dated October 1, 2019, formally requesting the extradition of Rory
    McGrath. The Home Office submitted supplemental information directly to the Department
    of Justice by letter on October 29, 2020. Copies of the note and the letter are attached to this
    declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for extradition. The United Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article 2 of the Annex.

6. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Fe, New Mexico on November 20th, 2020

TOM HEINEMANN

Attachments:

1. Copy of Note and Letter
2. Copy of Instrument with Annex



**British Embassy
Washington**

Embassy Note No:- 088/2019

**REQUEST FOR THE EXTRADITION OF RORY MCGRATH FROM THE UNITED STATES OF
AMERICA TO THE UNITED KINGDOM**

Her Britannic Majesty's Embassy presents its compliments to the Department of State and
encloses documents in support of the extradition from the United States of America of
RORY MCGRATH.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person
accused of the following offences:

- With others inflicted actual bodily harm upon Ian Geoffrey Moore at Aberford
  Road, Garforth, contrary to Section 47 of the Offences Against the Person Act
  1986 and;
- With others caused actual bodily harm to Ian Geoffrey Moore at the Miners Arms
  Public House, contrary to Section 47 of the Offences Against the Person Act 1986

The Embassy would be grateful if the enclosed papers could be transmitted as soon as
possible to the appropriate authorities with a request for the extradition of RORY MCGRATH
to the United Kingdom.

In the event of his return being ordered the Embassy would appreciate being notified as soon as possible so that arrangements can be made for his prompt return to the United Kingdom.

Her Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.



British Embassy, Washington DC

01 October 2019


# Home Office

Extradition Section
UK Central Authority
2nd Floor Peel
2 Marsham Street
London
SW1P 4DF

T 020 7035 3569
F 0207 035 6986
**www.gov.uk/government/
organisations/home-
office**

Rachel M. Yasser
U.S. Department of Justice
Office of International Affairs Counsel
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Date: 29 October 2020

**By email only: Rachel.Yasser2@usdoj.gov**

Dear Ms Yasser

**REQUEST FOR THE EXTRADITION OF RORY MCGRATH**

I am writing further to the request from the United Kingdom to the United States for the extradition of Rory McGrath, who is accused of inflicting actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861 and causing actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861.

In support of the request for Mr McGrath's extradition I am enclosing supplementary evidence prepared by Kate Leonard a Specialist Prosecutor at the Crown Prosecution Service. The supplementary evidence has been certified and authenticated by the UK Central Authority, Head of Extradition, Julian Gibbs.

Yours sincerely,

Ian Newman
Extradition Section
E: ian.newman2@homeoffice.gov.uk

Instrument as contemplated by Article 3(2) of the Agreement on Extradition
between the United States of America and the European Union signed 25 June 2003, as
to the application of the Extradition Treaty between
the Government of the United States of America and the Government of the
United Kingdom of Great Britain and Northern Ireland signed 31 March 2003

1.       As contemplated by Article 3(2) of the Agreement on Extradition between the
United States of America and the European Union signed 25 June 2003 (hereafter "the
Extradition Agreement"), the Governments of the United States of America and the
United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance
with the provisions of this Instrument, the Extradition Agreement is applied in relation
to the bilateral Extradition Treaty between the Government of the United States of
America and the Government of the United Kingdom of Great Britain and Northern
Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the
following terms:

a)       Article 5(1) of the Extradition Agreement shall be applied as set forth in
Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of
transmission of the extradition request and supporting documents;

b)       Article 5(2) of the Extradition Agreement shall be applied as set forth in
Article 9 of the Annex to this Instrument to provide for the requirements concerning
certification, authentication or legalization of the extradition request and supporting
documents;

c)       Article 7(1) of the Extradition Agreement shall be applied as set forth in
Article 12(4) of the Annex to this Instrument to provide for an alternative method for
transmission of the request for extradition and supporting documents following
provisional arrest;

d)       Article 8(2) of the Extradition Agreement shall  be applied as set forth in
Article 10(2) of the Annex to this Instrument to provide for the channel to be used for
submitting supplementary information;

e)       Article 10 of the Extradition Agreement shall be applied as set forth in
Article 15 of the Annex to this Instrument to provide for the decision on requests made
by several States for the extradition or surrender of the same person; and

f)       Article 14 of the Extradition Agreement shall be applied as set forth in Article
8 bis of the Annex to this Instrument to provide for consultations where the Requesting
State contemplates the submission of particularly sensitive information in support of a
request for extradition.

2.       The Annex reflects the integrated text of the operative provisions of the
2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into
force of this Instrument.

3.a)    This Instrument shall apply to the United States of America and to Great Britain and
Northern Ireland.  Subject to subparagraph b), the application of the 2003 Extradition Treaty to
the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

1

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b)      This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto.  The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4.      In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5.      This Instrument shall not apply to requests for extradition made prior to its entry into force.

6.      (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force.  The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed.  This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b)      In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16th day of December 2004.


FOR THE GOVERNMENT OF                    FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:                 THE UNITED KINGDOM OF GREAT
                                                          BRITAIN AND NORTHERN IRELAND:


                                                                                    2

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND
NORTHERN IRELAND

TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

Article 1
Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

Article 2
Extraditable Offenses

1.     An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2.     An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3.     For the purposes of this Article, an offense shall be an extraditable offense:

> (a)     whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

> (b)     whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4.     If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5.     If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

4

Article 3
Nationality

Extradition shall not be refused based on the nationality of the person sought.

Article 4
Political and Military Offenses

1.      Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.      For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)     an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)     a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c)     murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d)     an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)     placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f)     possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g)     an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3.      Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated.  In the United States, the executive branch is the competent authority for the purposes of this Article.

5

4.      The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law.  In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
### Prior Prosecution

1.      Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.      The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3.      Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

> (a)     have decided not to prosecute the person sought for the acts for which extradition is requested;

> (b)     have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

> (c)     are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
### Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7

### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

6

Article 8
Extradition Procedures and Required Documents

1.       All requests for extradition shall be submitted through the diplomatic channel.

2.       All requests for extradition shall be supported by:

      (a)       as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

      (b)       a statement of the facts of the offense(s);

      (c)       the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

      (d)       the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

      (e)       documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3.       In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

      (a)       a copy of the warrant or order of arrest issued by a judge or other competent authority;

      (b)       a copy of the charging document, if any; and

      (c)       for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4.       In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

      (a)       information that the person sought is the person to whom the finding of guilt refers;

      (b)       a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

      (c)       a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

7

(d)    in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

## Article 8 bis
### Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

## Article 9
### Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

## Article 10
### Additional Information

1.    If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2.    Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

## Article 11
### Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

## Article 12
### Provisional Arrest

1.    In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A

8

request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and such competent authority as the United Kingdom may designate for the purposes of this Article.

2.     The application for provisional arrest shall contain:

(a)     a description of the person sought;

(b)     the location of the person sought, if known;

(c)     a brief statement of the facts of the case including, if possible, the date and location of the offense(s);

(d)     a description of the law(s) violated;

(e)     a statement of the existence of a warrant or order of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f)     a statement that the supporting documents for the person sought will follow within the time specified in this Treaty.

3.     The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4.     A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5.     The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 13
Decision and Surrender

1.     The Requested State shall promptly notify the Requesting State of its decision on the request for extradition. Such notification should be transmitted directly to the competent authority designated by the Requesting State to receive such notification and through the diplomatic channel.

9

2.      If the request is denied in whole or in part, the Requested State shall provide reasons for the denial.  The Requested State shall provide copies of pertinent judicial decisions upon request.

3.      If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4.      If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 14
Temporary and Deferred Surrender

1.      If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.  If the Requesting State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2.      The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

Article 15
Requests for Extradition or Surrender Made by Several States

1.      If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2.      If the United Kingdom receives an extradition request from the United States and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3.      In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a)     whether the requests were made pursuant to a treaty;

(b)     the places where each of the offenses was committed;

(c)     the respective interests of the requesting States;

(d)     the seriousness of the offenses;

(e)     the nationality of the victim;

(f)     the possibility of any subsequent extradition between the requesting States; and

(g)     the chronological order in which the requests were received from the requesting States.

## Article 16
### Seizure and Surrender of Property

1.     To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.     The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

## Article 17
### Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article 18
### Rule of Specialty

1.     A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)     any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)     any offense committed after the extradition of the person; or

(c)     any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the

11

person's detention, trial, or punishment.  For the purpose of this subparagraph:

    (i)    the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

    (ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

2.    A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

    (a)    leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

    (b)    does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4.    If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.

### Article 19
### Transit

1.    Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State.  A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case.  A person in transit shall be detained in custody during the period of transit.

2.    Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State.  If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

12

Article 20
Representation and Expenses

1.      The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2.      The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered.  The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.      Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

Article 21
Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

Article 22
Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

13

The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to  express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."


In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's  Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself  of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004

**EMBASSY OF THE**
**UNITED STATES OF AMERICA**

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
London, England.  December 16, 2004



# Exhibit 2

**E.R.**

In forwarding the annexed papers, to be used in support of an application for the surrender from the United States of America of Rory McGrath who is accused of causing grievous bodily harm with intent, contrary to section 18 of the Offences against the Person Act 1861; two counts of inflicting bodily harm, contrary to section 20 of the Offences against the Person Act 1861; two counts of assault occasioning actual bodily harm, contrary to section 47 of the Offences against the Person Act 1861 and taking a conveyance without authority, contrary to section 12 of the Theft Act 1968.

I certify that to the best of my knowledge and belief, the signature of Richard David Kitson to the depositions, is the signature of Richard David Kitson, a District Judge at Leeds Magistrates' Court having authority to issue and receive the same and I further certify that such documents so signed by an officer having jurisdiction in the place where the same were issued and taken, and authenticated by a Minister of State and sealed with his official seal, would be received in evidence for similar purposes by the tribunals in Great Britain.

**Julian Gibbs**
Head of the Extradition Section
Home Office
29 June 2018



# THE
# EXTRADITION OF

# RORY McGRATH

# FROM

# THE USA

**STEVEN MICHAEL KINNON takes oath and states as follows:**

Introduction

1. I am a Police Officer based at Garforth Police Station in Yorkshire, within the jurisdiction of England and Wales which is a constituent part of the United Kingdom of Great Britain and Northern Ireland.

2. I make this deposition in connection with the extradition request for RORY MCGRATH.  His date of birth is 21 January 1959.  I am the Officer in charge of the investigation into the matters for which he is now accused, and his extradition is now requested.

3. It is my understanding that RORY MCGRATH is currently residing in the territory of the United States of America, having left the United Kingdom in order to avoid his trial for serious offences of violence committed against Ian Geoffrey MOORE.  It appears that he left the jurisdiction shortly after his appearance before a Magistrates Court in Leeds in relation to the prosecution against him.  He left the UK in or around October 1980.

4. I attach a copy of the warrant of arrest and the indictment to which it relates as my exhibit **SMK 1**.   The warrant for RORY MCGRATH was issued by a Crown Court Judge sitting at Leeds Crown Court on 24th October 1980 when he failed to answer bail to attend the Crown Court in response to these allegations.  It appears that MCGRATH left the jurisdiction shortly after his appearance at committal proceedings and has spent most of the ensuing period (and his life) overseas. He has now been located living in New York State, USA.   He has been at large for over 37 years.

5. RORY MCGRATH's extradition is sought for prosecution for offences of violence committed on 28th March 1980.

## Physical identification of MCGRATH

6. I attach, as my exhibit **SMK 2**, a photograph of the Defendant, RORY MCGRATH taken in 1980 when he was detained in custody in relation to this investigation.

7. I attach as my exhibit **SMK 3**, a photograph of the defendant in 2008 which I understand was taken in the USA in the course of a prosecution of RORY MCGRATH for robbery.

8. His address has been confirmed by Orangetown Police Department of New York State as: *240, Holt Drive, Pearl River, New York.*

9. I attach as my exhibit **SMK 4**, a copy of a more recent photograph of Rory McGrath taken from a Facebook profile circa 2016. This was obtained as a result of Social Media Research by West Yorkshire Police

## Facts

10. The factual basis of the case is fairly straightforward.  It involves two assaults, in a short period of time, by a group of youths on PC Ian Moore in Garforth, Leeds on Friday 28th March 1980. PC Moore is now retired but alive, well and willing to give evidence. He retired as a Police Sergeant.

11. The police witness statements provide the following information :-

a)  PC Moore came across a group of youths behaving rowdily on a garage forecourt.

b)  One member of that group, David Beaver, made an allegation of assault against an unknown male.

c)  The alleged assailant (later identified and convicted as Leslie Swithenbank) then appeared and sought to attack Beaver again.

d)  PC Moore managed to detain Swithenbank but was assaulted both by him and a group of his associates, being knocked to the ground and kicked repeatedly.

e)  When the group desisted and ran off, PC Moore gave pursuit and found the group in a pub car park. Some of them were in the process of getting into a car owned by Swithenbank. PC Moore sought to detain one member of the second group (not his

original attacker). That person then punched PC Moore in the face, and the group further attacked the officer, kicking him while on the ground.

f) PS Michael Cole arrived to assist PC Moore at the end of that attack. PC Moore indicated to him two youths who were running off.

g) PS Cole gave chase to those men but was unable to catch them.

h) Two days later, PS Cole saw Mr McGrath and identified him as one of the men whom he had chased.

i) PC Moore sustained facial injuries, the worst of which was a broken nose.

j) In the course of a subsequent section 6(1) committal hearing, PC Moore identified McGrath as the man who punched him in the face in the car park at the start of the second assault. This form of identification was of course normal practice at the time, prior to the enactment of the Police and Criminal Evidence Act 1984.

k) McGrath admitted in interview to having been in Garforth on the night in question. He stated however that he had not left the Gascoigne public house for a period covering the duration of the two assaults.

l) Further witnesses, however, gave descriptions of a group of youths drinking together in the Gascoigne public house. Descriptions were given closely matching Swithenbank and McGrath, and several witnesses stated that they left the public house for a period of approximately an hour and then returned together, in rather lower spirits than they had been earlier.

12. Identification:  No direct identifications were given, apart from those by PS Cole and by PC Moore in his deposition.  However, several witnesses gave detailed descriptions of McGrath and his associates.

13. Witness Statements were gathered, which provided the following detail:

a) Royal BECKETT.  He was the Landlord at the Crusader Hotel. He describes five young men behaving badly in his bar, one of them consistent with other descriptions given of McGrath that evening: " 6'0" tall, slim build, about 20 years old, light

brown hair which was curly. He was wearing a bright checked lumber jacket, the main colour being green."

b) David BEAVER gives evidence of being assaulted and seeking PC Moore's assistance, thus corroborating PC Moore's account, but does not give direct evidence against McGrath.

c) Andrew BOYES was with the initially-attacked David Beaver. He describes "a tall curly haired lad. . .He was at least 6 foot tall and his hair was brown with a high hair line... clean shaven." as involved in the attack on Beaver. This description fits McGrath and places him in company with Swithenbank. Such evidence makes it more likely that McGrath would have participated in the initial assault on PC Moore to rescue Swithenbank, and also that he would later seek to leave the scene in Swithenbank's car.

d) Stuart McNICHOL was aged sixteen at the time and saw both assaults but made no identification of any party.

e) David PARKER was also sixteen at the time. He was in company with McNichol and gives a similar detailed account of first assault. He does not identify make any identification, nor see the second assault.

f) Anthony RICHARDSON saw the initial fight between the Beaver and Swithenbank groups. He then went looking for his friend Leggott and did not see the assault on PC Moore. But he subsequently saw PC Moore injured and "I saw three lads climbing over fence at back of Miners', they were being chased by two blokes. One of these lads was wearing a blue shirt and I would say he was about six foot tall and about seventeen stone. He had pretty long straggly brown hair. One was wearing a black leather jacket and had dark curly hair which was shoulder length. The third was wearing like a blue sweat shirt. One of the men that was chasing them, I knew to be a policeman". Accordingly he corroborates PS Cole.

g) Kathleen HUDSON was working in the Gascoigne public house and gave good descriptions of Swithenbank, McGrath, Racz and Lunn as drinking in there. She further evidences that at 10pm they all left and at 10:45 McGrath & Racz (who was wet) came back in; McGrath bought 2 pints of bitter & 2 cigars. Swithenbank came back in later and was behaving in a subdued manner. This evidence rebuts McGrath's claim in interview that he did not leave the Gascoigne.

h) Percy HUDSON gives clear descriptions of Swithenbank, McGrath, Racz and Lunn in the Gascoigne and says "About 1, hour later I saw all these four men leave the

pub by the front entrance." At 10:45 Swithenbank, McGrath & Racz came back in "The one with the tooth missing was moving his arms backwards and forwards and he was demonstrating punching to his mates." This is important evidence as it rebuts McGrath's claim in interview that he did not leave the Gascoigne.

i) Martin RIDGWAY saw PC Moore chasing Swithenbank and sitting on him. He saw the first assault, and Swithenbank's departure. He gives a good description of Swithenbank.

j) Suzanne SIBERRY, having left the Miners' Arms, saw Swithenbank fall over the chain and Moore sit on him; she then saw all of the first attack, and Swithenbank running off. She gives no description nor identification of Swithenbank's associates.

k) Alan ROBERTSHAW describes being in the Gascoigne public house and seeing "a group of about 4 or 5 youths came in. I noticed them because they were making a bit of noise and swearing and noticed one had a beer can in his hand." He gives a description of the youth with a can as: "About 5'8" tall, wearing like a scruffy lumberyard type jacket, with like grey- or brown check. Fairish curly hair, tightly curled but it looked natural. He was wearing jeans I think. He may have had a tooth missing." This is consistent with the appearance of McGrath at the time. Robertshaw describes the group leaving the pub together and then the man consistent with McGrath and the biggest youth (widely accepted as Swithenbank) return together. His evidence thus rebuts McGrath's account in interview. Robertshaw has been traced and has a good recollection of events.

l) Jeanette SWEETING was in the Gascoigne and describes the four main defendants. "After they had been in the pub about 15 - 20 minutes, they all left, leaving only about ten other people in that room. About 10.45 pm two of these five men returned to the lounge , these two being the big fat one and the one who ' d had the beer can earlier. The big fat one [Swithenbank] did not have his jacket on nor did he have it with him.  The other one [McGrath] was carrying his jacket over his arm; he put it on before he sat down. They both got a pint of beer and sat down; they were very quiet compared to what they had been earlier." This is important evidence as it rebuts McGrath's claim in interview that he did not leave the Gascoigne.

m) Roger RICKETTS was the manager of the Gascoigne and again gives good descriptions of Swithenbank, McGrath (and less so Lunn) in his pub. He told off McGrath for drinking from a can brought in from outside. This evidence explains

why McGrath might have left the public house and goes some way to rebutting his claim to have stayed inside.

14. The medical evidence in the case is as follows :

    a) Dr C.S. KWOK saw PC Moore late on the evening of 28th March; he noted his patient had: an abrasion on his forehead with a 1 cm cut. There was a laceration on the right side of his scalp measuring 1 cm. There was an abrasion on his chin and he had chipped bottom and top incisor teeth. He also had a bruise over the bridge of his nose and he had been bleeding from his nose. His right thumb was bruised and was painful on flexion. The scalp laceration was closed with a single suture.

    b) Dr Michael BELLINI subsequently saw PC Moore on 31st March; he noted a fracture of PC Moore's left nasal bone and performed a reduction surgery under local anaesthetic the same day.

15. The photographic evidence in the case is as follows :

    a) On 2nd April 1980 DS Patrick CROWLEY took photographs of PC Moore's facial injuries.

    b) DC Nigel HALL also took photographs of PC Moore. DC Ralph PAVER took photographs of Swithenbank and the venue of the initial assault.

16. A number of interviews were carried out:

MCGRATH: In the face of robust questioning from DC Darley and DC Lincoln, McGrath gave inconsistent answers and was generally flippant toward the interview process: He initially denied being in Garforth on the night in question and claimed an alibi.

He said that he had only been released from prison at lunchtime on that day;
He said initially that he hadn't seen Swithenbank "in ages", and admitted that he had been in Swithenbank's Morris 1100 "but not recently". He then corrected himself to say that Swithenbank had dropped him off on Friday afternoon.
In a second interview he: conceded he was in the Crusader public house in a group thrown out for having cans of beer not bought on the premises; He admitted he was in

Swithenbank's car and went to another pub; and that he was "bollocked" in that pub for having a can with him; He said he stayed in the Gascoigne pub the rest of the night; he said he didn't sit in the front of the car; then changed his account when told that PC Moore had been attacked by someone getting into the back. In a third interview he: admitted he had been in Garforth with Swithenbank "and some other blokes... a big Scouse bloke and a tall one or two others"

SWITHENBACK Initially claimed that he was not in Garforth. Then conceded he was in Garforth and that his car was in the car park of the Miners Arms; that he was with four others (whom he would not name); that he has a noticeable missing tooth; that he had indeed been fighting with another group of youths "they were giving us a load of lip so I went and cracked one everybody joined in and we knacked 'em" ; that he had fallen over the chain (and had a mark on his stomach to prove it); that he was the person PC Moore sat upon; that he hit PC Moore in an attempt to get away, and his mates; that he kicked PC Moore once after breaking free; that McGrath was with him and "got one of the bastards off my back"; that he knew McGrath well; that after escaping PC Moore he returned to his car; that "Rory didn't get the chance to get in"; that Rory "booted the cop".

MICHAEL RACZ in interview admitted he was with McGrath and Swithenbank, plus two others known only by their nicknames. They went round various pubs in Swithenbank's white Morris; They were kicked out of a pub in Garforth; They had a fight with some other youths. He had been wearing a blue shirt and blue blazer. A full account of the first assault. That after the incident he went back into the Gascoigne pub and "Les and Rory came in after me".

WILLIE LUNN made full admissions to participating in the first fight and punching PC Moore 4 or 5 times. He subsequently gave a witness statement saying that McGrath left the Gascoigne pub with them, that "he was the worst" in the fight, and that PC Moore had had hold of McGrath at the start of the second incident.

FRANK AVEYARD said he was a participant in the first fight between the two groups, saw PC Moore being initially assaulted but did not participate, in the second "The silly cunt got hold of Rory this time" and that he participated in assaulting PC Moore to get him off McGrath.

Other matters relevant to the case

Swithenbank, Racz, Aveyard and Lunn were convicted on charges of ABH.  They each received custodial sentences for the convictions.

**Sworn at Leeds**

**Magistrates' Court on this**

**The 26th day of June 2018**

_(signature)_

**STEVEN MICHAEL KINNON**

**Before me:**

_(signature)_

-------------------------------------------------------------------------

**District Judge / ~~Justice of the Peace (Magistrates Court)~~**

**Exhibit – Steven Michael Kinnon**

Exhibit SMK/1 – Warrant of arrest and indictment

**Sworn at Leeds Magistrates' Court**

**On this the 26th day of June 2018**

Signed: ---------------------------------------

Signed: ---------------------------------------

District Judge/~~Justice of the Peace~~

# the Crown Court (Code No. 0620 )

## at LEEDS

## on 24ᵗʰ October 1980

No. 801856
No. 801861

NOTE: *Delete alternatives as appropriate.*

ALL CONSTABLES ARE ORDERED

To arrest RORY MCGRATH D. 1. 59.

of 148 Swarcliffe Drive, Leeds 14

who, having been released on bail subject to a duty to surrender to the custody of the Crown Court, has failed to surrender as required

and

~~EITHER~~

1. bring him/her forthwith before the Crown Court or a Magistrates' Court

~~OR~~

~~2. release him/her on bail unconditionally (subject to the following condition (s))~~

    To be complied with BEFORE release on bail:

    to provide surety / sureties in the sum of £

    to secure the surrender of the defendant to custody at the time and place directed

    AND (OR)

B.    ~~To be complied with AFTER release on bail:~~

~~to appear at the Crown Court at~~
(or such other place as shall be notified)

on

[on such day and at such time as the Court may direct]

~~THERE to surrender himself/herself into custody.~~

Judge of the Crown Court

Date:

**Form 5061**
Warrant for arrest

MCR 8/78 TC'

No.

## INDICTMENT

**IN THE CROWN COURT AT LEEDS**

**THE QUEEN - v – LESLIE SWITHENBANK,  RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD**

**LESLIE SWITHENBANK,  RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD are charged as follows:**

**Count 1**

### STATEMENT OF OFFENCE

CAUSING GRIEVOUS BODILY HARM WITH INTENT, Contrary to s18 of the Offences against the Person Act 1861

### PARTICULARS OF OFFENCE

LESLIE SWITHENBANK, RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD, on the 28th day of March 1980 caused grievous bodily harm to IAN GEOFFREY MOORE, with intent to resist the lawful apprehension of the said LESLIE SWITHENBANK.

**Count 2**

### STATEMENT OF OFFENCE

INFLICTING GRIEVOUS BODILY HARM, Contrary to s20 of the Offences against the Person Act 1861

### PARTICULARS OF OFFENCE

LESLIE SWITHENBANK, RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD, on the 28th day of March 1980, in Aberford Road, Garforth, unlawfully and maliciously inflicted grievous bodily harm on IAN GEOFFREY MOORE.

**Count 3**

### STATEMENT OF OFFENCE

ASSAULT OCCASIONING ACTUAL BODILY HARM, contrary to section 47 of the Offences Against the Person Act 1861.

### PARTICULARS OF OFFENCE

LESLIE SWITHENBANK, RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD, on the 28th day of March 1980, in Aberford Road, Garforth, assaulted IAN GEOFFREY MOORE thereby occasioning him actual bodily harm.

**Count 4**

### STATEMENT OF OFFENCE

INFLICTING GRIEVOUS BODILY HARM, Contrary to s20 of the Offences against the Person Act 1861

### PARTICULARS OF OFFENCE

LESLIE SWITHENBANK, RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD, on the 28th day of March 1980, on the Miner's Arms public house car park, unlawfully and maliciously inflicted grievous bodily harm on IAN GEOFFREY MOORE.

**Count 5**

### STATEMENT OF OFFENCE

ASSAULT OCCASIONING ACTUAL BODILY HARM, contrary to section 47 of the Offences Against the Person Act 1861.

### PARTICULARS OF OFFENCE

LESLIE SWITHENBANK, RORY PATRICK MCGRATH, MICHAEL RACZ, WILLIE LUNN and FRANK AVEYARD, on the 28th day of March 1980, on the Miner's Arms public house car park, assaulted IAN GEOFFREY MOORE thereby occasioning him actual bodily harm.

Count 6

## STATEMENT OF OFFENCE

Taking a conveyance without authority, contrary to Section 12 of the Theft Act 1968

## PARTICULARS OF OFFENCE

WILLIE LUNN, on the 28th March 1980, without the consent of the owner of other lawful authority took a conveyance, namely a Ford Cortina motor car, registered number YLY 353 H for his own use.

*HBParkinson*

**Officer of the Court**

17 – 10 – 80

**Exhibit – Steven Michael Kinnon**

Exhibit SMK/2 – Photograph of Rory McGrath taken in 1980

**Sworn at Leeds Magistrates' Court**

**On this the 26th day of June 2018**

Signed: -------------------------------------

Signed: ----------------------------------------------------

District Judge/~~Justice of the Peace~~



**Local Police Id:** 2006596
**Name:** MCGRATH, RORY
**DOB:** 21/01/1959

**Exhibit – Steven Michael Kinnon**

Exhibit SMK/3 – Photograph of Rory McGrath taken in 2008

**Sworn at Leeds Magistrates' Court**

**On this the 26th day of June 2018**

Signed: ---------------------------------------

Signed: ---------------------------------------------

District Judge/~~Justice of the Peace~~

IORY, F.   DOB 01/21/1953   Race WHITE   Sex MALE   Hgt 600"   Wgt 180   Hair BLACK   Eyes GREEN
GORIA, NY 11103   Phone 9172070243   SSN 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   Jacket 0000735804A

**Exhibit – Steven Michael Kinnon**

Exhibit SMK/4 – Photograph of Rory McGrath taken in 2016

**Sworn at Leeds Magistrates' Court**

**On this the 26th day of June 2018**

Signed: -------------------------------------

Signed: -------------------------------------------

District Judge/Justice of the Peace



**KATE LEONARD takes oath and states as follows:**

1. I am a barrister practicing within the jurisdiction of England and Wales and currently employed as a specialist prosecution by the Crown prosecution Service. My expertise includes criminal law and the law of extradition. I am well acquainted with the criminal law of England and Wales.

2. It is my understanding that RORY MCGRATH is currently residing in the territory of the United States of America, having left the United Kingdom in order to avoid his trial for serious offences of violence committed against Ian Geoffrey MOORE.   It appears that he left the jurisdiction shortly after his appearance before a Magistrates Court in Leeds in relation to the prosecution against him in October 1981.

3. I confirm that RORY MCGRATH was Indicted for the following offences, all committed on 28th March 1980 against the same victim, a police officer:

    (1) With others caused grievous bodily harm to Ian Geoffrey Moore with intent to resist the lawful apprehension of Leslie Swithenbank, contrary to Section 18 of the Offences Against the Person Act 1986 ('s.18');

    (2) With others inflicted grievous bodily harm to Ian Geoffrey Moore at Aberford Road, Garforth, contrary to Section 20 of the Offences Against the Person Act 1986 ('s.20');

    (3) With others inflicted actual bodily harm upon Ian Geoffrey Moore at Aberford Rd, Garforth, contrary to Section 47 of the Offences Against the Person Act 1986 ('s.47');

    (4) With others inflicted grievous bodily harm to Ian Geoffrey Moore at the Miners Arm public house, contrary to Section 20 of the Offences Against the Person Act 1986.

    (5) With others caused actual bodily harm to Ian Geoffrey Moore at the Miners Arm public house, contrary to Section 47 of the Offences Against the Person Act 1986.

4. I confirm that I have seen a copy of the warrant of arrest for RORY MCGRATH issued by a Crown Court Judge sitting at Leeds Crown Court on 24th October 1980 when he failed to answer bail to attend the Crown Court in response to these allegations. The warrant has not been withdrawn. This means that RORY MCGRATH is to be immediately arrested by a UK police constable should he be encountered within the jurisdiction of England and Wales.

5. I the 1980's the Crown Prosecution Service had decided there was sufficient evidence to provide a realistic prospect of conviction against McGrath and a number of co-Defendants listed in the Indictment.

6. The Crown Prosecution Service has carried out a recent thorough review, including tracing witnesses who gave evidence in the trial against McGrath's co-Defendants.

7. The outcome of the trial against the co-Defendant's is known. Swithenbank, Racz, Aveyard and Lunn were all convicted on charges of Actual Bodily Harm. According to the Crown Prosecution Service Assault Occasioning Actual Bodily Harm would be the appropriate charge using current National Charging Standards, bearing in mind the medical and photographic evidence of PC Moore's facial injuries.

8. Accordingly, in 2018, the Crown Prosecution Service remains of the view there is sufficient evidence to prosecute MCGRATH for offences today and that it is in the public interest to seek extradition.

9. I can confirm that RORY MCGRATH is being prosecuted for these offences. His status is that of an accused person.

10. None of the conduct occurred outside of the jurisdiction of England and Wales.

11. The conduct, an assault, is clearly an extradition offence under the Extradition Act 2003.

12. I confirm RORY MCGRATH has previous convictions including a strikingly similar offence of assaulting a police officer in Wetherby in 1979. This would show a propensity current at the time of the offence towards the commission of such offences. A Court is likely therefore to admit the fact of his earlier conviction as evidence against RORY MCGRATH at his trial.

13. I confirm that if the prosecution witnesses are unable to be traced or are now deceased, given the time that has passed since these offences were committed there are hearsay provisions which would permit the Court to accept their written evidence as evidence in the case against RORY MCGRATH. I note there is a very recent statement supporting the prosecution from the victim himself and at least one other eye-witness available to give evidence. The other statements could be read at trial.

14. It is my understanding that the decision of the Crown Prosecution Service is to seek RORY MCGRATH's extradition for Counts 3 and 5 of the original Indictment i.e. for the Section 47 offences of assault occasioning actual bodily harm. Nonetheless, for completeness, I set out the law in relation to Section 18, Section 20 and Section 47 of the Offences Against the Person Act 1986, below.

## APPLICABLE UK LEGAL PROVISIONS

### ASSAULT OCCASIONING ACTUAL BODILY HARM

**Mode of trial**

15. Assault occasioning actual bodily harm is an offence which can be tried before a Judge and Jury in the Crown Court.

**Sentence**

16. Upon conviction a Court may pass a sentence of imprisonment not exceeding five years.

**Limitation**

17. There is no time limit on the institution of proceedings for an offence of assault.

**Ingredients of the offence**

18. The term "assault" is an act by which a person intentionally or recklessly causes another to apprehend immediate unlawful personal violence or to sustain unlawful personal violence. In this case the prosecution can prove there was an act or acts carried out intentionally or recklessly whereby unlawful force was applied to the complainant. The extent of the force is irrelevant. Clearly considerable force was applied as can be seen in the photographic evidence.

19. The prosecution must prove bodily harm was caused. That is easy to do in this case as the complainant gives an account of his injuries; there are contemporaneous notes from hospital staff and photographs taken at the time.

**Mens rea**

20. This offence may be committed with a reckless mindset. Recklessness involves foresight of the possibility that the complainant will be subjected to unlawful force, however slight, and taking that risk or foresight of the possibility that the complainant would apprehend immediate and unlawful violence and taking that risk.

## CAUSING OR INFLICTING GRIEVOUS BODILY HARM (WITH & WITHOUT INTENT)

**Mode of trial**

21. Causing or inflicting grievous bodily harm are offences which can in the case of Section 20 or must in the case of Section 18 be tried before a Judge and Jury in the Crown Court.

**Sentence**

22. Upon conviction of an offence under s.20 the Court may impose a sentence of imprisonment not exceeding five years.

23. Upon conviction of an offence under s.18 the maximum penalty is life imprisonment.

**Limitation**

24. There is no time limit on the institution of proceedings for these offences.

**Actus reus**

25. "**Grievous bodily harm**" means serious bodily harm. It is not necessary that the harm should be either permanent or dangerous nor is it a precondition that the victim should require treatment or that the harm would have lasting consequences. In assessing whether particular harm was "grievous", account had to be taken of the effect on, and the circumstances of, the particular victim.

26. **"Causing" or "Inflicting"** there used to be a distinction between the terminology "causing" and "inflicting" where the allegation was of causing grievous bodily harm. There is now no distinction between the terminology "causing" or "inflicting". There is no requirement of physical contact between the defendant and the victim. Grievous bodily harm can be "inflicted" without an assault and without the direct or indirect application of force to the victim's person.

27. **Causing grievous bodily harm with intent to resist arrest / lawful apprehension (s.18).** The prosecution must prove the following:

    (a) that the Defendant ("D") deliberately harmed the Police Officer ("PC V");

    (b) that by harming PC V, D caused him to suffer grievous bodily harm (which means "really serious injury");

    (c) that when D harmed PC V, he was acting "maliciously". The word "maliciously" has a particular legal meaning, which is that he either (i) intended to cause PC V some injury, however slight; or (ii) was aware of a risk that he might cause PC V some injury, however slight, but took that risk; and

    (d) that when D struck PC V, he intended to prevent PC V from lawfully arresting him or another.

28. **Causing grievous bodily harm** (s.20). The prosecution must prove the following:

    (a) that D used some unlawful force on the victim;

(b)  that when he did so D was acting "maliciously". The word "maliciously" has a particular legal meaning which is that he either   (i) intended to cause V some injury, however slight; or (ii) was aware of a risk that he might cause V some injury, however slight; but took that risk; and

(c)  that in the event D caused V to suffer a wound/grievous bodily harm (which means "really serious injury").

**Mens rea**

29. Section 18 of the Offences Against the Person Act 1986 generally requires proof of intent to cause grievous bodily harm.  In the case of resisting arrest, a person may maliciously cause another grievous bodily harm with intent to resist or prevent the lawful apprehension of any person.

30. On an allegation of an intent to cause grievous bodily harm, the jury must be sure that the defendant intended to cause serious bodily harm to the victim by reference to all the relevant circumstances and in particular what he did and what he said about it.

31. On an allegation of resisting arrest maliciousness must be proved.  A person would be guilty of the Section 18 offence if it is proved that he intends or foresees some injury however slight will be caused by his actions.

32. Section 20 of the Offences Against the Person Act 1986 does not require proof of intent but requires proof that the offender acted maliciously.   The word "maliciously" has a particular legal meaning which is that he either : (i) intended to cause the victim some injury, however slight; or (ii) was aware of a risk that he might cause the victim some injury, however slight; but took that risk.   The harm intended or foreseen does not need to amount to grievous bodily harm.  An intent to cause minor injury which results in serious injury is sufficient.

**JOINT ENTERPRISE**

33. Legal liability for a criminal offence may arise in the following circumstances in which a person is involved with another or others:

(1) by his own conduct and with the necessary fault, D committed the offence with another he is a principal offender;

(2) by his own conduct and with intent, D assisted another (P) to commit the offence;

(3) by his conduct and with intent, D encouraged another (P) to commit the offence;

(4) D "commanded or commissioned" (i.e. ordered or suggested) the offence committed by another (P) and P committed it with the necessary fault.

34. Any person who aids, abets, counsels or procures the commission of any indictable offence, is liable to be tried and punished as a principal offender. It has always been sufficient to prove that D was either the principal or accessory it is not necessary to specify what role D is alleged to have played.

35. Where there are several participants in a crime, D will be a principal offender if his conduct fulfils the *actus reus* element of the crime and at the time of performing the *actus reus* he had the relevant *mens rea*. There is no need for D and P to act with a common purpose to commit the crime together although in cases of joint principals they usually will: they may for example both independently engage in attacking V, each intentionally causing him GBH by their blows. If each has by his own acts caused GBH then he is liable as a principal.

36. In almost all cases the prosecution will allege that one or more Ds are guilty because he/they must have been either a principal offender or an accessory/secondary party. In such cases it is not necessary for the jury to be satisfied whether any one D was a principal or an accessory, provided that they are satisfied that he participated.

37. A secondary party may, exceptionally, rely on the fact that he has withdrawn from the criminal venture prior to P's acts. What constitutes effective withdrawal depends on the circumstances of the case. D's conduct must demonstrate unequivocally his voluntary disengagement from the criminal enterprise. In addition, D must communicate to P his withdrawal and do so in unequivocal terms unless physically impossible in the circumstances. This requirement for timely

effective unequivocal communication applies equally to cases of spontaneous violence, unless it is not practicable or reasonable to communicate the withdrawal. In a case in which the participants have engaged in spontaneous violence, in practice the issue is not whether there had been communication of withdrawal but whether a particular defendant clearly disengaged before the relevant injury or injuries forming the allegation were caused. In some instances D throwing down his weapon and walking away *may* be enough. Whether D is still a party to the crime is a question of fact and degree for the jury to determine. Where D is one of the instigators of the attack, more may be needed to demonstrate withdrawal.

38. Where several people inflict injuries on a victim, it is the totality of the injuries which are to be considered. It is immaterial that one person joins in the attack slightly after the others have begun to inflict injuries, which may have included the most serious single injury. A person is aiding the commission of the offence and participating in it as soon as he joins in.

39. Responsibility for a criminal offence may be incurred either as a principal offender or as an accessory. A principal offender is the actual perpetrator of the offence, the person whose individual conduct satisfied the definition of the particular offence in question, whilst an accessory is one who aids, abets, counsels or procures the commission of the offence. For indictable offences, the Accessories and Abettors Act 1861, s. 8, provides that such an accessory 'shall be liable to be tried, indicted, and punished as a principal offender'.

**INTOXICATION**

40. The effect of a defendant's intoxicated state on his criminal liability would have no relevance to his culpability for offences, unless his intoxicated state was involuntary. It would not be a defence to the charges unless the Crown is required to prove specific intent. An honest belief in the need to act in self-defence or defence of others which results from an intoxicated mistake may not be relied upon as a defence.

**ALTERNATIVE OFFENCES**

41. Offences 2 and 3 are alternatives.  Offences 3 and 4 are alternatives.  In each case, if the prosecution were not able to prove the injuries were serious so to engage Section 20, the offender would be guilty of the lesser offence under Section 47.

## EXTRADITION

42. Extradition to and from the UK is governed by the UK Extradition Act 2003 hereafter the EA 2003.

43. Section 150 EA 2003 provides the specialty constraints that will be observed by the UK in connection with this case.

(1)This section applies if—

(a)a person is extradited to the United Kingdom from a category 2 territory under law of the territory corresponding to Part 2 of this Act, and

(b) the territory is a Commonwealth country, a British overseas territory or the Hong Kong Special Administrative Region of the People's Republic of China.

(2)The person may be dealt with in the United Kingdom for an offence committed before his extradition only if—

(a)the offence is one falling within subsection (3), or

(b)the condition in subsection (6) is satisfied.

[This is subject to section 151B.]

(3)The offences are—

(a)the offence in respect of which the person is extradited;

(b)a lesser offence disclosed by the information provided to the category 2 territory in respect of that offence;

(c)an offence in respect of which consent to the person being dealt with is given by or on behalf of the relevant authority.

(4)An offence is a lesser offence in relation to another offence if the maximum punishment for it is less severe than the maximum punishment for the other offence.

(5)The relevant authority is—

(a)if the person has been extradited from a Commonwealth country, the government of the country;

(b)if the person has been extradited from a British overseas territory, the person administering the territory;

(c)if the person has been extradited from the Hong Kong Special Administrative Region of the People's Republic of China, the government of the Region.

(6)The condition is that the protected period has ended

(7)The protected period is 45 days starting with the first day after his extradition to the United Kingdom on which the person is given an opportunity to leave the United Kingdom.

(8)A person is dealt with in the United Kingdom for an offence if—

(a)he is tried there for it;

(b)he is detained with a view to trial there for it.

44.   The circumstances in which a further request for consent can be made by the UK are outlined at section 151B EA 2003.  This provides;

(1)Section 150 or 151A does not prevent a person in whose case that section applies from being detained with a view to trial in England and Wales for an offence if the conditions in subsection (2) are satisfied.

(2)The conditions are that—

(a)the United Kingdom and the territory from which the person was extradited have each made a declaration under Article 14(3) of the Extradition Convention, and the declarations are still in force;

(b)the Secretary of State makes a request for the consent referred to in section 150(3)(c) or 151A(3)(c) in respect of the offence ("the consent request");

(c)the Secretary of State gives notification, which is explicitly acknowledged on behalf of the territory, of the date on which the detention is to begin ("the notified date").

(3)The Extradition Convention is the European Convention on Extradition done at Paris on 13 December 1957.

(4)This section applies only to detention during the period beginning with the notified date and ending with whichever of the following occurs first—

(a)if a notification of opposition to the detention is given on behalf of the territory, the date on which Secretary of State receives it;

(b)the date on which the Secretary of State receives notification given on behalf of the territory as to whether the consent request is granted or refused;

(c)the expiry of the period of 90 days beginning with the date on which the consent request is received

45. Should RORY MCGRATH be acquitted and be desirous of being returned to America, then pursuant to s. 153 EA 2003 he simply has to make a request and under subsection (5) of that provision the UK Secretary of State must arrange free transportation with as little delay as possible to the territory from which he was extradited to the UK.

46. Section 153C EA 2003 states that if the Requested State extradites an individual for the purposes of prosecution in the UK subject to the condition that he should be returned to serve any sentence in the Requested state; that that undertaking can be given on behalf of the UK by the Secretary of State for the Home Department.

**Sworn at Leeds**
**Magistrates' Court on this**
**The 26th day of June 2018**

*K. M. Leonard*

**KATE LEONARD**

**Before me:**

**District Judge / ~~Justice of the Peace (Magistrates Court)~~**

### *LEEDS MAGISTRATES' COURT*

### 26th day of June 2018

I, RICHARD DAVID KITSON the undersigned, one of the District

Judges/~~Justices of the Peace (Magistrates' Court~~) sitting at Leeds Magistrates' Court

hereby certify that the written and photographic matters contained in the foregoing

pages are the depositions of **STEVEN MICHAEL KINNON** and **KATE**

**LEONARD** and true copies of exhibits referred to in the said depositions for

apprehension of **RORY MCGRATH**  laid and sworn before me at Leeds

Magistrates' Court on the 26th day of June 2018.

*GIVEN **under my hand and seal*** this 26th Day of June 2018 at Leeds Magistrates'

Court.

**Signed:** ...................................................................

District Judge/~~Justice of the Peace (Magistrates' Court~~)



Extradition Section
UK Central Authority
2nd Floor Peel
2 Marsham Street
London
SW1P 4DF

T 020 7035 3569
F 0207 035 6986
**www.gov.uk/government/
organisations/home-
office**

Rachel M. Yasser
U.S. Department of Justice
Office of International Affairs Counsel
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Date: 29 October 2020

**By email only: Rachel.Yasser2@usdoj.gov**

Dear Ms Yasser

**REQUEST FOR THE EXTRADITION OF RORY MCGRATH**

I am writing further to the request from the United Kingdom to the United States for the extradition of Rory McGrath, who is accused of inflicting actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861 and causing actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861.

In support of the request for Mr McGrath's extradition I am enclosing supplementary evidence prepared by Kate Leonard a Specialist Prosecutor at the Crown Prosecution Service. The supplementary evidence has been certified and authenticated by the UK Central Authority, Head of Extradition, Julian Gibbs.

Yours sincerely,

Ian Newman
Extradition Section
E: ian.newman2@homeoffice.gov.uk

# E.R.

In forwarding the annexed papers, to be used in support of an application for the surrender from the United States of America of Rory McGrath, who is accused of inflicting actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861 and causing actual bodily harm, contrary to Section 47 of the Offences Against the Person Act 1861.

I certify that, to the best of my knowledge and belief, the signature on the supplementary evidence dated 22 October 2020 contained herein is the signature of Kate Leonard, Barrister and Specialist Extradition Prosecutor with the Crown Prosecution Service of England and Wales.

I further certify that the documents authenticated here are in support of the request for the surrender of Rory McGrath.

**Julian Gibbs**
Extradition Section
Home Office

27 October 2020

# SUPPLEMENTAL EVIDENCE

# EXTRADITION OF

# RORY MCGRATH

# From

# The USA

# SUPPLEMENTAL EVIDENCE

# EXTRADITION OF

# RORY MCGRATH

# From

# The USA

## SUPPLEMENTAL INDEX TO STATEMENT AND EXHIBITS

**Name**                                                              **Page No.**


LEONARD, Kate                                                              1

Kate Leonard makes oath and states as follows:-

I am a Barrister and Specialist Extradition Prosecutor with the Crown Prosecution Service of England and Wales. I am the lawyer responsible for the extradition request in respect of Rory McGrath, date of birth 21 January 1959.

This deposition is supplementary to my deposition sworn at Leeds Magistrates' court on 26 June 2018. The purpose of this supplementary deposition is to correct a typographical error in my original deposition.

Rory McGrath is sought for prosecution for offences contrary to the Offences Against the Person Act 1861. In my original deposition this is referred to as the Offences Against the Person Act 1986. I confirm that this is an error and that there is no such 1986 Act. All references to offences should read contrary to the 1861 Act.

I further confirm that the maximum penalty for the offences sought is five years' imprisonment and this was also the case when these alleged offences were committed in 1980.

**Signed: K.M. Leonard………………………………………    KATE LEONARD**

**Dated: …22/10/2020……………………………………..**

1