UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────x

**UNITED STATES OF AMERICA,**

        Plaintiff,

    -v-                                    Case No. 7:21-mj-5058

**RORY MCGRATH,**

        Defendant.
───────────────────────────────────────x

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO EXTRADITION

 

James Kousouros, Esq.
Law Offices of James Kousouros
*Attorney for Rory McGrath*
260 Madison Avenue, 22nd Floor
New York, New York 10016
Phone: (212) 532-1934
Fax: (212) 532-1939

# **TABLE OF CONTENTS**

EXHIBITS…………………....………………………………………………………………3

PRELIMINARY STATEMENT..................................................................................................4

ARGUMENT…………….......................................................................................................7

    I.    *The Government Has Failed to Conform with the Applicable Treaty*…………............7
    II.   *The Evidence of Mr. McGrath's Identification Fails to Establish Probable Cause*........................................................................................................................10

CONCLUSION.........................................................................................................................16

# **EXHIBITS**

**Exhibit A**    Statement of PC Ian Moore

**Exhibit B**    Statement of PS Michael Cole

**Exhibit C**    Sworn Statement of PS Michael Cole

**Exhibit D**    The 2003 Extradition Treaty

**PRELIMINARY STATEMENT**

The Government, acting on behalf of the government of the United Kingdom, alleges that on March 28, 1980, Defendant Rory McGrath along with several co-defendants assaulted Police Constable ("PC") Ian Moore on two separate occasions resulting in various injuries including a broken nose.

Specifically, it is alleged that, on the night of March 28, 1980, PC Moore attempted to break up a fight between David Beaver and Leslie Swithenbank outside of a pub in Garforth in Leeds, England. *See* Compl. ECF No. 2 at ¶ 7(a); and **Exhibit A**, PC Moore's Statement (dated April 3, 1980) at 3 ("I tried to stop them but I couldn't, neither of them seemed to want to stop.... I was telling them to pack it in, but they took no notice of me.") At some point, PC Moore gave chase to Mr. Swithenbank who hit a chain and fell to the ground. **Exhibit A** at 4. PC Moore got on top of Mr. Swithenbank, straddled him, and attempted to arrest him. *Id*. Mr. Swithenbank resisted, and PC Moore was then assaulted by other individuals from behind. PC Moore did not get a good look at any of these other individuals. **Exhibit A** at 5. ("I can't describe any of these others but I knew what I had to do and that was to cover up and protect myself.")

After the other individuals ran off, PC Moore began to chase them. He describes four or five individuals running away. *Id*. He caught up to them in a parking lot and grabbed one individual from behind who, according to him, immediately turned around and punched him in the face. *Id*. at 6. It is alleged that this individual was Mr. McGrath. At the time, Mr. McGrath was 21 years old.

Sergeant Michael Cole, who had been off-duty and drinking at a pub nearby, arrived to find PC Moore on the ground. He bent down and asked "Who's done it?" *See* **Exhibit B**, statement of Sergeant Cole (dated May 11, 1980) at 1. PC Moore was only semi-conscious. *Id*. Cole then

dragged Moore to his feet, shook him, and asked "Which way did they go?" Moore then opened his eyes and pointed at two men who were running away. *Id* at 2. Cole chased after the two men in the dark but could not catch them.

The following day, Mr. McGrath was identified—*from behind*—by Police Sergeant Michael Cole who allegedly saw Mr. McGrath running from the scene. **Exhibit B** at 2-3; and **Exhibit C**, Sworn Statement of Sergeant Cole, at 2. ("[T]here in front of me was a man with his back towards me. The clothing was different but the hair was exactly the same as the hair on the man I had chased through the gardens.") It is clear from his recitation that Sergeant Cole never saw the faces of the two men he was chasing. In any event, Mr. McGrath was arrested and brought before the court.

As Mr. McGrath was presented in court, PC Moore identified Mr. McGrath in Court in a procedure known as a "dock identification" which is akin to a "show-up".

Five men, including Mr. McGrath, were indicted on or about October 17, 1980. A warrant was issued on or about October 24, 1980, when Mr. McGrath failed to return to Court. It is undisputed that Mr. McGrath came to the United States.

In the intervening decades, the United States entered into various extradition treaties with the United Kingdom and the European Union. As relevant here, the United States entered into an extradition treaty with the United Kingdom on March 31, 2003 ("the 2003 Treaty") (attached hereto as **Exhibit D**). On June 25, 2003, the U.S. entered into an Agreement on Mutual Legal Assistance with the European Union ("the U.S.-E.U. Agreement").[1] And, as contemplated by Article 3(2) of the U.S.-E.U. agreement, on December 16, 2004, the U.S. and the United Kingdom executed an Instrument with Annex amending the Treaty of March 31, 2003 ("the 2004

---

[1] This 413-page document can be found at: https://www.congress.gov/109/cdoc/tdoc13/CDOC-109tdoc13.pdf

Instrument"). Exhibit 1 to Compl., ECF No. 2 at 14-29. The 2004 Instrument expressly incorporated various provisions of the U.S.-E.U. Agreement. *Id*. at ¶ 1(a)-(f).

On October 1, 2019, nearly 40 years after the alleged assault on PC Moore, the United Kingdom requested the extradition of Mr. McGrath via a diplomatic note. Another year passed, and the United Kingdom Home Office submitted further information on October 29, 2020. The documents in support of Mr. McGrath's extradition were purportedly certified by Julian Gibbs, head of the extradition section of the U.K. Home Office. While we have been provided with a copy of the diplomatic note (attached to the Complaint as Exhibit 1), we have not been provided with the response from the United States nor any documents reflecting additional action taken in the interim between the issuance of the diplomatic note and the response thereto.

In the interim, on January 31, 2020, the United Kingdom left the European Union (also known as "Brexit").

Mr. McGrath was arrested on May 14, 2021 and brought before the Honorable Paul E. Davison. Based upon several factors, including but not limited to Mr. McGrath's personal history and myriad health conditions, he was released on a personal recognizance bond in the amount of $1,000,000 secured by four financially responsible persons and $250,000 property with strict pre-trial conditions. In the ensuing months, the conditions have been modified to permit Mr. McGrath to work outside of his home. Mr. McGrath has been fully compliant with the conditions of his release.

The undersigned first appeared for the defendant on June 11, 2021. We spent weeks exercising our best efforts to contact the U.K. extradition authorities to request re-consideration of the extradition request and to negotiate a less burdensome disposition. In late June, 2021 we were able to contact Kate Leonard and were advised to send our request for re-consideration to her, and

she would then forward our submission to the Crown Prosecutor handling the matter. We sent our request on July 29, 2021, and we received a response that counsel would be on vacation until August 2, 2021. On August 27, 2021, we received a reply denying our request. We thereafter retained the services of counsel in the United Kingdom to liaison with the authorities there and have since been attempting to negotiate an alternative resolution in this matter. Counsel in the United Kingdom was able to obtain and provide further documentation regarding this case on October 7, 2021.

## ARGUMENT

### I. *The Government Has Failed to Conform with the Applicable Treaty*

The United Kingdom seeks Mr. McGrath's extradition pursuant to the 2004 Instrument. However, as will be set forth below, the 2004 Instrument was invalidated when the United Kingdom left the European Union on January 31, 2020. As such, the request for extradition should be denied.

As will be set forth below, when the United Kingdom left the European Union, the United Kingdom ceased to be a party to the June 25, 2003 Agreement on Mutual Legal Assistance between the United States and the European Union. U.S.-E.U. Agreement at Art. 1, 2, 3.

Specifically, Article 2 of the U.S.-E.U. Agreement defines the "Contracting Parties" to the agreement as the European Union and the United States. Article 2 further defines "Member State" as a member state of the European Union. Additionally, Article 3(1) states: "The European Union… and the United States of America shall ensure that the provisions of this Agreement are applied in relation to bilateral mutual legal assistance treaties between the Member States and the United States of America…." As set forth by the unambiguous terms of U.S.-E.U. agreement, the United Kingdom is no longer a "member state" of the European Union, and therefore, it is no

longer covered by the U.S.-E.U. agreement.

This is significant because the 2004 Instrument between the United States and the United Kingdom expressly states that in the event the U.S.-E.U. Agreement is terminated, then the 2003 Treaty shall be applied.  2004 Instrument at 6(b) ("In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied.") (Exhibit 1 to Compl., ECF No. 2 at 15).  While the U.S.-E.U. Agreement is still in effect with respect to European Union and its "member states", it is not in effect with respect to the United Kingdom.[2]  Thus, Mr. McGrath's extradition has to conform with the requirements set forth in the 2003 Treaty and not the 2004 Instrument.

The 2003 Treaty and 2004 Instrument differ in one critical respect—the authentication of documents for the extradition hearing.  The 2004 Instrument requires, under Article 9 of the Annex, that:

> Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

The documents provided in support of Mr. McGrath's extradition have been certified by Julian Gibbs, head of the extradition section of the United Kingdom Home Office in accordance with the 2004 Instrument.  (*See* Exhibit 2 to Compl., ECF No. 2 at 31).  However, the 2003 Treaty requires that all supporting documentation must be certified "by the principal diplomatic or

---

[2] Indeed, the United Kingdom and the European Union entered into a new post-Brexit extradition agreement on December 24, 2020. (https://ec.europa.eu/info/sites/default/files/draft_eu-uk_trade_and_cooperation_agreement.pdf) However, notwithstanding the new agreement between the U.K. and the E.U., it appears that at least 10 E.U. member states are currently refusing extradition of their own nationals to the U.K after Brexit.  *See* "At least 10 EU Countries will not extradite criminals to UK because of Brexit", https://www.independent.co.uk/news/uk/home-news/brexit-security-agreement-eu-extradition-arrests-b1822469.html. The United States has not entered into any post-Brexit agreement with the United Kingdom.

principal consular officer of the United States resident in the United Kingdom." 2003 Treaty, Art. 9(b). Specifically, Article 9 of the 2003 Treaty, "Authentication of Documents", provides as follows:

> The documents that support an extradition request shall be deemed to be authentic and shall be received in evidence in extradition proceedings without further proof if:
>
> (b) regarding a request from the United Kingdom, they are certified by the principal diplomatic or principal consular officer of the United States resident in the United Kingdom, as provided by the extradition laws of the United States.

It should be noted that these are the same requirements for authentication in extradition hearings as set forth by federal statute in 18 U.S.C. § 3190 which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, ***and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.*** (emphasis added).

Julian Gibbs, the head of the extradition section of the United Kingdom Home Office, is not the proper individual authorized to certify the request herein. As the United Kingdom has not complied with the 2003 Treaty authentication provisions or United States federal law, and the documents in support of Mr. McGrath's extradition have not been properly authenticated, the United Kingdom's request for the extradition of Mr. McGrath must be summarily denied.

We are aware of a Southern District of Florida case where similar arguments were made by the defendant and rejected by the Magistrate Judge. *See Flynn v. Barr*, 2020 U.S. Dist. LEXIS 109789 (S.D. Fla 2020). However, that case is not binding on this Court. And, in that case, the

9

Government rectified the situation prior to the extradition hearing by having the documents certified by the proper entities. In any event, we submit that the Southern District of Florida erred when ignoring the clear import of the United Kingdom leaving the European Union and its effect on the treaties as outlined above.

## II. The Evidence of Mr. McGrath's Identification Fails to Establish Probable Cause

As the Government correctly points out in their Memorandum of Law, the Government bears the burden of establishing probable cause that Mr. McGrath committed the crime in question. Here, while an alleged assault of PC Moore has been set forth, we submit that the evidence submitted by the Government fails to establish Mr. McGrath's identity as the perpetrator of the attack.

Two witnesses purported to identify Mr. McGrath as a perpetrator in this case. These procedures do not establish probable cause. The first witness to identify Mr. McGrath, Sergeant Michael Cole, identified Mr. McGrath *from behind and based on the hair of the individual he identified*. As a preliminary matter, Sergeant Cole had been drinking and was not an actual witness to the alleged crime. When he responded to the scene, he briefly spoke to PC Moore who pointed in the direction of two people who were already running away. **Exhibit B** at 2. Sergeant Cole chased these two individuals but could not catch them. He never saw the faces of the individuals he was chasing. He saw them from behind, in the dark and after he had been drinking. The next day, Sergeant Cole saw Mr. McGrath in the police station *from behind* and purported to identify him by his hair. *Id*.

While acknowledging that "many people have hair styles like that", Cole identified Mr. McGrath only by his hair. **Exhibit C** at 2-3. Raising serious doubts about the credibility and

10

accuracy of this *from-behind* identification, Cole also stated, "I don't know who it was. It was dark. It was too dark then to see what the man's hair was like." *Id*. at 3. He continued, "Only came light when they went out of the first set of allotments and they ran through the first set of houses and they were caught in the street lighting, that was for two or three seconds, it is on this basis that I recognised McGrath's hair the following evening, it really stood out in the sodium lighting." *Id*. By his very statements, this identification does not support probable cause. It supports the notion that Mr. McGrath may have hair similar to countless others all over the world. We respectfully submit that the Court should give no evidentiary weight to this identification.

The only other identification of Mr. McGrath occurred in Court after he had been arrested. The United Kingdom concedes that this subsequent "dock identification" of Mr. McGrath by PC Moore involved outdated police procedures which were replaced nearly forty years ago by the Police and Criminal Evidence Act of 1984 (PACE 1984). Exhibit 2 to Compl., ECF No. 2 at 35, ¶ 11(j).

This form of identification, where the accused is identified *for the first time* during a Court proceeding, is referred to as a "Dock Identification".[3] As the Crown Prosecution Service warns, "[i]n view of the dangers posed by a dock identification ... the prosecution ... will not invite a witness to identity, who has not previously identified the accused at an identity parade, to make a dock identification unless the witness' attendance at a parade was unnecessary or impracticable, or there are exceptional circumstances."[4] *Ibid*. "A judge will normally prohibit any such identification during a trial on indictment but different considerations may apply in minor summary offences." *Ibid*.

While a dock identification is not inadmissible *per se*, the Crown Court has warned of the

---

[3] *See* CPS, *Identification*, https://www.cps.gov.uk/legal-guidance/identification
[4] An "identity parade" is another term for a line-up.

procedure's inherent unreliability and has limited the circumstances in which such identifications will be considered. *See*, e.g., *Neilly v. Queen, The*, [2012] 2 Cr. App. R. 20 at [29] ("In the case of dock identifications, however, there is an added and separate need for caution, arising from the circumstances inherent in dock identification.") *See also*, *Holland v. HM Advocate*, 2005 WL 1248403 (2005) at [47] ("When a witness is invited to identify the perpetrator in court, there must be a considerable risk that his evidence will be influenced by seeing the accused sitting in the dock in this way. So a dock identification can be criticised in two complementary respects: not only does it lack the safeguards that are offered by an identification parade, but the accused's position in the dock positively increases the risk of a wrong identification.") The *Holland* Court also noted the nearly-two-century-old recognition of the dangers of dock identifications:

> Not surprisingly, the dangers of dock identification have been as obvious to Scottish authors and official bodies as to those in other parts of the world. Indeed, as long ago as 1833, in his Practice of the Criminal Law of Scotland, p 628, Alison recognised that a dock identification of the accused was open to the observation that "his being in that situation helped them to believe he was the same".

*Id*. at [50].

As this Court and the Government are aware, the jurisprudence in the United States closely mirrors that of the United Kingdom. A vast body of case law has emerged to address both the inherent unreliability of suggestive identification procedures, such as the one at issue, as well as the fallibility of human perception in ordaining to identify a culprit. See, e.g., *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); and *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972). Indeed, the United States Supreme Court recognized the inherent pitfalls of suggestive identifications even prior to the incident that unfolded on the night of March 28, 1980. *See United States v. Wade*, 388 U.S. 218, 228 (1967) ("[T]he annals of criminal law are rife with instances of

mistaken identification.")  Indeed, in the ensuing years, our system of justice has allowed for the use of experts on the issue of identification at both hearings and trials.

The Second Circuit has long recognized the potential unreliability of eyewitness identification testimony. Its recent decision in *United States v. Nolan* is no exception – holding from its outset: "Eyewitness identification testimony is notoriously prone to error." 956 F.3d 71, 75 (2d Cir. 2020). However, *Nolan* went further, endorsing "[a] growing body of scientific research"[5] that has "clarified and expanded what factors a court should examine in determining whether to exclude eyewitness identification testimony," *id.* at 80, and holding that counsel "failed to render reasonable professional assistance by neglecting to call or even consult an expert to testify about the unreliability of the eyewitness identifications under the egregious circumstances presented in this case," *id.* at 81.

Here, Mr. McGrath was first purportedly identified by an officer who had chased him in the dark, caught a glimpse of the back of his head for "2-3 seconds" and was only able to identify him by his hair (despite conceding that many people had the same hairstyle, namely, curly hair). Mr. McGrath was arrested based on this specious identification.  For unknown reasons, no line-up (parade) was conducted, no photo array was compiled, and not even a show up identification was presented to the victim officer.  PC Moore only identified Mr. McGrath, while he was already in custody, in Court and seated next to his co-defendant.  This is the only actual identification in this case. We respectfully submit that this highly suggestive identification of Mr. McGrath, when

---

[5] *See* NATIONAL RESEARCH COUNCIL, *Identifying the Culprit: Assessing Eyewitness Identification* (2014); Charles A. Morgan III et al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, 27 Int'l J. L. & Psychiatry 265 (2004); Stephanie J. Platz & Harmon M. Hosch, *Cross-Racial/Ethnic Eyewitness Identification: A Field Study*, 18 J. Applied Soc. Psychol. 972 (1988); Kenneth A. Deffenbacher et al., *Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. Experimental Psychol.: Applied 139 (2008); Elin M. Skagerberg, *Co-Witness Feedback in Line-Ups*, 21 Applied Cognitive Psychol. 489 (2007).

viewed in conjunction with the lack of other reliable evidence, fails to establish probable cause that Mr. McGrath committed a crime and that at a minimum, a hearing should be held to further elucidate the circumstances pursuant to which this identification occurred. In this regard, we submit that the testimony of both officers is warranted.[6]

We are mindful that "that there exists no rule specifying which identification procedures are competent for use in extradition proceedings, and such evidence need not be rejected *merely* because United States procedures governing the admissibility of an identification at trial were not followed." *In re Extradition of Valles,* 268 F. Supp. 2d 758 (S.D. Tex. 2003) (emphasis added). *See also Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) ("[A]lthough the magistrate may take the circumstances of an identification into account in assessing its reliability, there is no *per se* rule that specifies which identification procedures are 'components' for probable cause purposes.") While we acknowledge that there is no *per se* rule, this does not eviscerate this Honorable Court's obligation to evaluate the probable cause required to sustain the extradition request. There is no *per se* rule that permits any identification procedure to suffice.

The extant circumstances warrant the Court's scrutiny. Not only was the identification procedure highly suggestive, but PC Moore's recitation of his ability to view the perpetrators casts serious doubt on his ability to correctly identify anyone. *See* **Exhibit A**. We urge the Court to take the circumstances of the identification here into account, and find that the United Kingdom's reliance on the highly suggestive "dock identification", in the absence of any indicia of reliability, fails to establish probable cause. Alternatively, we ask that the Court conduct a hearing during which the circumstances of the procedure and identification can be elucidated. To be clear, this is, in our view, the singular basis upon which probable cause can be found. Contrary to the

---

[6] We also submit that, given the burden of having witnesses flown to the United States, especially during the pandemic, a "virtual" hearing could be conducted. The defendant would consent to an evidentiary hearing in this manner.

government's assertions, the peripheral evidence cited does not move the evidentiary needle beyond that provided for by this suggestive procedure.

The Government claims that various witnesses corroborated the events of that night. That an assault took place is corroborated. However, upon closer inspection, it is clear that the accounts given by the "witnesses" all have one thing in common—they fail to identify Rory McGrath as the perpetrator of a crime. Most of the descriptions are given of an individual at a pub. However, even these descriptions are inconsistent. Some describe dark, curly hair. Some describe light, curly hair. Some say the individual was 6' tall, others say 5'8. One witness says the curly-haired individual was wearing a checked green shirt, another says the curly-haired individual was wearing a black bomber jacket. Perplexingly, it does not appear that a single witness was ever shown a photograph of McGrath and asked to positively identify him. Mr. McGrath should not be put to suffer the paucity of evidence or failure to employ simple investigative procedures.

As discussed above, this was an in-court identification with, as far as we can discern, no procedural safeguards in place. Mr. McGrath was in custody seated in the courtroom next to his co-defendant, Leslie Swithenbank, who PC Moore had initially chased, struggled with, and tried to arrest. Presumably, Moore was told that Sergeant Cole had also identified him. Or at least it was implicitly understood that *someone* had identified Mr. McGrath in the crime. Moreover, as Mr. McGrath was in custody, there is no reasonable explanation for why a proper identification procedure, such as a line-up, could not have been utilized. This is not a case in which due to unavoidable circumstances a dock identification was necessary. The officer was in the building, Mr. McGrath was in custody. A reliable identification procedure was readily possible.

Absent any reliable evidence identifying Mr. McGrath as a perpetrator in this case, the People have failed to establish probable cause to certify the extradition of Mr. McGrath to the

United Kingdom.

As a final note, given the passage of time – over 40 years—Mr. McGrath's ability to contest the allegations relied on by the Government to establish probable cause is all but extinguished. His ability to locate witnesses is long gone and even if he were able to locate potential witnesses, their memories after over 40 years would not be productive. In a similar vein, the Government's ability to rehabilitate the faulty identification of Mr. McGrath is also futile. Absent a proper identification of Mr. McGrath, probable cause to extradite him does not and cannot exist.

## **CONCLUSION**

For the foregoing reasons, the Government's request to certify Mr. McGrath's extradition to the United Kingdom should be denied, or in the alternative, a hearing should be conducted to fully develop the relevant facts necessary for a just and proper determination of the issues presented herein.

Dated:          October 17, 2021

Respectfully submitted,

_____/s/_____
James Kousouros, Esq.
Law Offices of James Kousouros
*Attorney for Rory McGrath*
260 Madison Avenue, 22nd Floor
New York, New York 10016
Phone: (212) 532-1934
Fax: (212) 532-1939
